UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

FRED WALRAVEN,

                Plaintiff,                       Case No. 14-cv-12517

v.                                     Honorable Thomas L. Ludington

BAY COUNTY SHERIFF JOHN MILLER, in his
Official and Individual Capacities,

                Defendants.

_____/

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT,
DISMISSING COUNT I OF PLAINTIFF'S COMPLAINT WITH PREJUDICE,
DISMISSING COUNTS II AND III OF PLAINTIFF'S COMPLAINT WITHOUT
PREJUDICE, DENYING DEFENDANTS' MOTIONS *IN LIMINE* AS MOOT AND
DENYING MOTION FOR LEAVE TO FILE SUPPLEMENTAL BRIEF**

This case may raise many legitimate questions. It does not, however, raise a question of First Amendment retaliation. Pled only as such, it must be dismissed.

Defendants Bay County Sheriff's Department and Bay County Sheriff John Miller move for summary judgment on all of Plaintiff Fred Walraven's claims. *See* Defs.' Mot. Summ. J., ECF No. 31. Walraven claims that Defendants violated both federal and Michigan law by terminating his employment on April 15, 2014. *See* Pl.'s Compl. ECF No. 1. According to Walraven, his termination was retaliation for the exercise of his First Amendment rights, a violation of 28 U.S.C. § 1983. Defendants also, according to Walraven, violated the Michigan Public Employment Relations Act and Whistleblowers' Protection Act by terminating him.

Defendants disagree and have moved for summary judgment on Walraven's claims. They argue that Walraven has not established a genuine dispute of material fact that his First Amendment rights were violated. Further, Defendants claim he cannot demonstrate a connection

between his union activity and his termination, a showing necessary to maintaining a PERA claim. Lastly, Defendants argue that Walraven cannot demonstrate that his case meets the elements of a Whistleblowers' Protection Act claim.

Because Walraven does not have a cognizable First Amendment retaliation claim, that count of his complaint will be dismissed with prejudice. Walraven's remaining state law causes of action will be dismissed without prejudice.

## I.

Plaintiff Fred Walraven is a former Correctional Facility Officer ("CFO") and Sergeant at the Bay County Jail. His employment was terminated on April 15, 2014. Defendant Bay County Sheriff's Department is the law enforcement agency of the Bay County government. The Sheriff's Department is tasked with the administration of the Bay County Jail. Defendant John Miller is the Bay County Sheriff.

What follows is a brief summary of the facts that gave rise to this lawsuit. They are not necessarily the facts that are germane to Walraven's legal claims. Indeed, those facts are few. Understanding and placing the facts relevant to Walraven's claims in context, however, requires a broader understanding of the activity at the Bay County Jail in late 2013 and early 2014. That chronicle is what follows.

## A.

Beginning in late 2013, conduct occurred at the jail that led to a series of internal investigations being conducted. In total, three internal investigations were conducted with one employee being reprimanded, one terminated, and another resigning. The employee that was terminated was Walraven. All three of the investigations began in early 2014 and concluded

within a few months. Only two of the three investigations are relevant to Walraven and so only those two will be discussed.[1]

### 1.

Captain Troy Stewart is the jail administrator at the Bay County Jail. As Jail administrator he is tasked with the "care and custody" of the inmates. Shore Dep. 64, Ex. R, Def.'s Mot. Summ. J., ECF No. 31-19. Taking this responsibility perhaps too seriously, Stewart procured a bottle of prescription mouthwash for an inmate suffering from rather severe halitosis. Stewart procured the bottle through his wife, at the time a dental assistant. But since the inmate could not leave the jail to be examined by an outside dentist, and because the inmate was not a patient of this dentist, Stewart had the bottle prescribed to his wife. He then picked up the bottle of mouthwash at the pharmacy, scratched off his wife's name, and left the bottle, with use instructions, for the inmate.

Not unexpectedly, the information that Stewart procured this mouthwash for an inmate spread. Also not unexpectedly, rumor spread, that the mouthwash contained a controlled substance.[2] Word spread from the inmates to the jail staff. When the tale of the mouthwash became embellished, Stewart decided that he should report to Undersheriff Troy Cunningham that he had brought the mouthwash into the jail.

Upon learning of Stewart's conduct from his undersheriff, Sheriff Miller ordered an investigation. Miller Dep. 10-11, Ex. T, Def.'s Mot. Summ. J., ECF No. 31-21. Miller appointed Sergeant Michael Shore to conduct the investigation. *Id.* The investigation began on January 13,

---

[1]   The third investigation related to allegations of misconduct by Matthew Gillis, another CFO and president of the CFO union. That investigation resulted in Gillis resigning. Gillis's resignation has spawned a companion case, docketed as *Gillis v. Miller and the Bay County Sheriff's Department*, Case No. 14-12518.

[2]   The rumor was that the bottle brought in by Captain Stewart contained codeine cough syrup. It did not.

2014 and involved interviewing a number of individuals in the jail, including Stewart. Shore Dep. 11, 16.

Because of the claims that the mouthwash was a controlled substance smuggled into the jail, Sergeant Shore treated the investigation as one into criminal activity. Shore Dep. 21-22. This could result in a number of different outcomes, including prosecution. As a result, all individuals interviewed were instructed not to discuss the investigation with anyone but the Sheriff and Undersheriff. *See, e.g.*, Shore Interview Notes, Ex. U, Def.'s Mot. Summ. J., ECF No. 31-22. Despite being treated as a criminal investigation, the investigation events were never memorialized in a police report, as is common. Shore Dep. 23-24. This was done at the direction of Undersheriff Cunningham. *Id.*

The investigation concluded on February 27, 2014 with Sergeant Shore furnishing a report to Sheriff Miller in early March. The report was forwarded to the Bay County Prosecutor on March 10, 2014. See Case Review Sheet, Ex. U, Def.'s Mot. Summ. J., ECF No. 31-22. On March 25, 2014, the Bay County Prosecutor reviewed Sergeant Shore's report and declined to prosecute, noting "lack of criminal intent – insuff. evid to establish violation of criminal statutes." *Id.* (sic throughout).

A copy of the report was also sent to the Sheriff. On the basis of the report, Sheriff Miller met with Captain Stewart to discuss and respond to the allegations of his conduct. Following that meeting, Sheriff Miller issued a letter of reprimand to Captain Stewart. Sheriff Miller wrote:

> Pursuant to your meeting on April 4, 2014, you were given an opportunity to respond to allegations made that you supplied drugs to prisoners. While the facts show that you did not, you were actually looking out for the welfare of the prisoner in question. You did use poor judgment. I hope that no further incidents of similar nature occur.
>
> I have no choice but to place a letter of reprimand in your file. This will remain in your file subject to review at a later date.

Letter of Reprimand, Ex. U, Def.'s Mot. Summ. J., ECF No. 31-22.

## 2.

Not long after Stewart brought the mouthwash into the jail, another allegation of misconduct arose and resulted in an investigation targeting Walraven. The report of misconduct was allegedly anonymous, brought to jail administration's attention by a "kite" (or, as it may be more commonly known outside a jail, a note) slipped under the door of Undersheriff Cunningham on January 23, 2014. The note simply requested that Undersheriff Cunningham review jail security footage from the night shift "on certain dates and at certain times." Cunningham Aff., Ex. W, Def.'s Mot. Summ. J., ECF No. 31-24. The security footage from the dates and times listed in the "kite" showed CFOs "engaged in numerous unacceptable activities, including cell phones in the jail, playing cards for extended periods of time, damaging jail property, conducting outside business when in the jail[,] not monitoring video security cameras as necessary[,] and various other violations of department policy." *Id*. Defendant Walraven was the supervising CFO during all of these shifts. *Id*. Undersheriff Cunningham ordered Sergeant Shore to conduct an investigation into "any improper employee practices by the CFO's [sic] on duty and shared the information on the tapes with him." *Id*. Thus, began Sergeant Shore's second investigation.

In Undersheriff Cunningham's deposition, he makes no mention of this "kite" but instead states more generally that "some employees complaining" about Walraven led to Shore's investigation. Cunningham Dep. 9, Ex. 10, Pl.'s Resp., ECF No. 34-11. He also admits that he was aware of employees making comments to Sergeant Shore about Walraven during the investigation into Captain Stewart. *Id*. at 9-10. One interview where the topic of Walraven arose was Sergeant Shore's interview with Deputy Jeff Sargeson. *See* Shore Interview Notes, Ex. U.

Sergeant Shore interviewed Deputy Sargeson on January 17, 2014, one week before the "kite" was slipped under Undersheriff Cunningham's door.[3]

Sergeant Shore began his investigation into Walraven's conduct on January 27, 2014. *See* Shore Interview Notes, Ex. Z, Def.'s Mot. Summ. J., ECF No. 31-27. Sergeant Shore conducted the final interview in the Walraven investigation on March 4, 2014. Id. Despite the investigation into Walraven being non-criminal, Sergeant Shore requested that each interviewee not share anything discussed in the interviews. *Id*.

Walraven places particular emphasis on Sergeant Shore's interview of Sergeant Lester Cosineau. During this interview, Cosineau made a number of allegations concerning Walraven's conduct, or misconduct. Cosineau also relayed to Sergeant Shore that Walraven was "fired up" about the investigation into Captain Stewart's conduct. Cosineau told Sergeant Shore that Walraven believed that the investigation should be conducted by the Michigan State Police. Further, Walraven apparently told Cosineau (who then told Shore) that if the administration started "'going after' employees over this" Walraven would go "right to the Bay City Times to let them know." Shore Interview Notes, Ex. Z. Cosineau also told Sergeant Shore that he heard Walraven and Matthew Gillis, another correctional officer, discussing the possibility of going to Human Resources concerning the way the investigation into Captain Stewart was being conducted. *Id*.

During the investigation into Walraven, Sergeant Shore also interviewed Bay County employee Cherri Colmus-Harper on January 28, 2014. Shore Interview Notes, Ex. Z. Harper expressed to Sergeant Shore that she felt uncomfortable around Walraven and that Walraven would make comments to her that she felt were inappropriate and she had to actively avoid

---

[3]    Despite Undersheriff Cunningham's apparent knowledge of the complaints against Walraven in the Stewart Investigation interviews, Sergeant Shore testified during his deposition that the investigation of Walraven was initiated by the "kite" under Undersheriff Cunningham's door.

Walraven around the jail. *Id*. Sergeant Shore treated these claims as allegations of sexual harassment and "explained to Harper the severity of Sexual Harassment in the workplace." *Id*. (sic to capitalization).

At some point during the investigation into Walraven's conduct, Sheriff Miller determined that Walraven should be placed on administrative leave. Walraven's leave began on February 18, 2015. The letter placing Walraven on leave explained the purpose and terms of his leave as follows:

> The purpose of this leave is to allow the Sheriff's Office the opportunity to conduct an investigation. It is our desire to complete the investigation in a timely manner and bring closure to any alleged charges of impropriety. Your administrative leave will be in effect until further notice.
>
> You are hereby ordered to contact the administration each day, Monday through Friday at 9:00 am for further instruction. Other than your Union Representative, you are not to make contact by phone, mail or in person with any employee of the Sheriff's Office or Court Facility. You are not to be in the Law Enforcement Center or Court Facility without prior approval of the administration. Be further advised that you are not to represent yourself as a member of the Bay County Sheriff's Office during your leave.

Administrative Leave Letter, Ex. A, Def.'s Mot. Summ. J., ECF No. 31-2.

**B.**

On February 12, 2014, after the investigations into Captain Stewart and Walraven had commenced but before Walraven was placed on leave, a "Weingarten notice" ("Notice") was posted on an employee bulletin board in the Bay County Jail. The Notice was posted by Matthew Gillis, a corrections officer and the CFO union president. The Notice stated:

> Hello everyone I would like to express my gratitude in being your Union President. I feel there is a very important issue that needs to be discussed. Many deputies have been notified they need to report to a superior officer for some type of investigatory interview or investigation. When you are summoned before a superior officer, I strongly suggest you state these words before you say anything else. ""If this discussion could in any way lead to me being disciplined or discharged, I request that my Union representative be present at the meeting. Without representation, I choose not to answer and questions." These rights also

cover yourself in the event someone else may be disciplined due to your statement. I am in no way advising you not to cooperate with management; just advising you of your rights.

It is your responsibility to ask for the representation. It is not the responsibility of management to advise you of this. Attached are the actual Weingarten Rights. Please review them as they are extremely important for yourself and everyone else. Even if you don't think you need representation, it has been proven it is better to have another set of ears as sometimes words are taken out of context.

In conclusion you have the right to discuss union matters with your Union President and Vice President. Some of oyu may have been ordered not to discuss what was said in a meeting with your superiors. I strongly recommend you advise us of what happened for your protection and others. Again, thank you for your time and I look forward to working with everyone.

Respectfully,

Matt Gillis (POLC LOCAL)

[Signature]

Weingarten Notice, Ex. AA, Def.'s Mot. Summ. J., ECF No. 31-28 (sic throughout).[4]

At least one employee expressed concern over the Notice and brought his concern to Captain Stewart, the jail administrator. *See* Kerbleski Aff., Ex. BB, Def.'s Mot. Summ. J., ECF No. 31-29; Stewart Dep., 83-84.[5] Captain Stewart passed these concerns on to Undersheriff Cunningham. Eventually, Sheriff Miller was informed of the Notice and scheduled a meeting with Gillis on February 13, 2014. Undersheriff Cunningham and another union representative (besides Gillis), John Oliver, were present. At the meeting, Sheriff Miller angrily confronted Gillis about the Notice. Gillis Dep. 19, Ex. 13, Pl.'s Resp., ECF No. 34-19. Sheriff Miller asked Gillis if he wrote the Notice. Gillis admitted that he did, with help from Walraven. *Id*. During the

---

    [4]    The copy of the Notice that was uploaded is very poor quality. Although it is readable in its entirety, some of the punctuation may not be discernible. Any missing or erroneous punctuation is due to the copy's quality.

    [5]    CFO Jeff Kerbleski signed an affidavit explaining that he expressed concern over the Notice to Captain Stewart. Captain Stewart's deposition does not reflect hearing from Kerbleski but does indicate that he was notified of the Notice by Sergeant Jeff Vanness and after hearing from Vanness, reported the Notice to Undersheriff Cunningham.

conversation, Sheriff Miller went on to threaten Gillis with possible criminal prosecution for posting the Notice. Gillis was never prosecuted, nor is there any evidence that Sheriff Miller did any more than threaten prosecution.

## C.

On April 14, 2014, Sheriff Miller notified Walraven, by letter, of the allegations of misconduct that resulted from Sergeant Shore's investigation. *See* Alleged Misconduct Letter, Ex. 16, Pl.'s Response, ECF No. 34-17. The allegations of misconduct were:

1. Deliberately scratching the newly polished floor in the jail on January 22, 2014.

2. Making disparaging comments about staff who [sic] had polished the floor on this occasion.

3. Falsely stating to Deputy Booth on or about January 16, 2014, that you had not spoken negatively to Captain Troy Stewart about Deputy Booth.

4. Failing/refusing to provide a password which was necessary to operate the County's computer system, to Deputy DesJarlais despite his numerous requests, from October 2013 through January 2014 when Captain Stewart issued him a password.

5. Referring to Undersheriff as a "dumb fuck" in the presence of other staff in the latter part of January 2014.

6. Bringing your laptop computer to conduct personal business (outside employment) on numerous occasions, including, most recently, January 8, 2014.

7. Allowing subordinate employees to bring, and use, cell phones in the jail.

8. Playing card games with staff while on duty in the jail, sometimes in excess of 4 hours on:
    a. January 2, 2014
    b. January 8, 2014
    c. January 10, 2014
    d. January 13, 2014
    e. January 22, 2014

9. Referring to road patrol officers as "lazy fucks" in the presence of staff.

10. Bringing in, and using, a cell phone in the jail.

11. Failing/refusing to obey the directive for you not to have contact with Sheriff Office staff by contacting Sgt. Vanness by telephone on or about March 18. [sic] 2014.

*Id*. The letter went on to direct Walraven to appear for a hearing with Sheriff Miller the next day where he would have "an opportunity to respond to the above charges." *Id*. Walraven was permitted to have his union representative present. *Id*.

The hearing was held as scheduled. That same day, Sheriff Miller issued a letter of termination to Walraven. Termination of Employment Letter, Ex. 18, Pl.'s Resp., ECF No. 34-19. The letter informed Walraven that Sheriff Miller had considered the results of Sergeant Shore's investigation and Walraven's explanation of the incidents from the April 14, 2014 letter. Sheriff Miller "concluded that [Walraven] engaged in the conduct." *Id*. As a result of Walraven's conduct, Sheriff Miller was left "no choice but to terminate [Walraven's] employment, effective immediately." *Id*.

Walraven filed this lawsuit on June 26, 2014.

## II.

A motion for summary judgment should be granted if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The focus must be "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby*, 477 U.S. 242, 251–52 (1986). The moving party has the initial burden of identifying where to look in the record for evidence "which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the opposing party who must set out specific facts showing "a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (citation omitted).

- 10 -

The Court must draw all reasonable inferences in favor of the non-movant when reviewing the evidence and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id*. at 251–52, *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "Entry of summary judgment is appropriate 'against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Walton v. Ford Motor Co.*, 424 F.3d 481, 485 (6th Cir. 2005) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

## III.

Walraven alleges three claims in his complaint: First Amendment retaliation in violation of 28 U.S.C. § 1983; violation of the Michigan Public Employment Relations Act; and unlawful retaliation in violation of the Michigan Whistleblowers' Protection Act. Defendants move to dismiss all three claims.

## A.

Walraven brings his claim of First Amendment retaliation under 28 U.S.C. § 1983. He alleges that Defendant Sherriff Miller violated § 1983 by retaliating against him for exercising his right to freedom of speech and expression as protected by the First Amendment of the United States Constitution. *See* Compl. ¶¶ 42-60, ECF No. 1.

Defendant argues that the claim should be dismissed for the following reasons: (1) Walraven cannot maintain a § 1983 claim against Sherriff Miller in his official capacity as Sheriff of Bay County because he has failed to raise a genuine issue of material fact that the Bay County Sheriff's Department has a policy or custom that caused the alleged First Amendment violation; (2) Walraven has not established a prima facie case of First Amendment Retaliation;

(3) Walraven was not engaged in protected activity when he posted the Notice; (4) Walraven did not suffer any injury or adverse action by Defendants; (5) Sheriff Miller is entitled to qualified immunity in his individual capacity; and (6) the Notice was not a substantial or motivating factor in Walraven's interview prior to his termination. Defendants' second argument will be addressed first because it is dispositive of Walraven's claim.

To establish a claim under § 1983 a "plaintiff must establish both that 1) []he was deprived of a right secured by the Constitution or laws of the United States and 2) the deprivation was caused by a person acting under color of state law." *Redding v. St. Eward*, 241 F.3d 530, 532 (6th Cir. 2001). A public employee bringing a First Amendment retaliation claim under § 1983, such as Walraven, must make the following prima facie case of retaliation:

> (1) he engaged in constitutionally protected speech or conduct; (2) an adverse action was taken against him that would deter a person of ordinary firmness from continuing to engage in that conduct; (3) there is a causal connection between elements one and two—that is, the adverse action was motivated at least in part by his protected conduct.

*Dye v. Office of the Racing Comm'n*, 702 F.3d 286, 294 (6th Cir. 2012) (quoting *Scarbrough v. Morgan Cnty. Bd. of Educ.*, 470 F.3d 250, 255 (6th Cir. 2006)). "If the plaintiff makes this showing, the burden then shifts to the defendant to show by a preponderance of the evidence that it would have taken the same action even in the absence of the protected conduct." *Leary v. Daeschner*, 228 F.3d 729, 737 (6th Cir. 2000) (internal quotation marks omitted).

Public employees must make a heightened showing when demonstrating that their speech was "constitutionally protected." *See id.* This showing requires a two-step inquiry. First, the employee must establish that the speech in question "touched on matters of public concern." *Id.* (citing *Connick v. Myers*, 461 U.S. 138, 146 (1983)). Speech that touches on matters of public concern has been defined by the Supreme Court as "speech relating to any matter of political,

social, or other concern to the community." *Dye*, 702 F.3d at 295 (quoting *Connick*, 461 U.S. at 146).

If the plaintiff can show that his speech touched on a matter of public concern, his speech is then subjected to the *Pickering* balancing test. *See Pickering v. Board of Educ.*, 391 U.S. 563 (1968). Under *Pickering*, a court must weigh "the employee's interest "in commenting upon matters of public concern" against "the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Leary*, 228 F.3d at 737 (quoting *Pickering*, 391 U.S. at 568). The Supreme Court has articulated the following considerations that courts must take into account when applying the Pickering balancing test: "whether the statement impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise." *Dye*, 702 F.3d at 295 (quoting *Rankin v. McPherson*, 483 U.S. 378, 388 (1987)). Determining whether a public employee's speech is protected is a question of law. *Id.*

The speech at issue is Matt Gillis's posting of the Notice. Although Gillis posted the Notice and was the only individual who signed it, Walraven argues that Miller and the County were on notice as early as February 13, 2015 that Walraven participated in the drafting of the Notice. It was then, according to Walraven, that the political machinery of the Bay County Sheriff's Department turned its focus to him. Walraven argues that the Notice addresses matters of public concern because it was posted in the context of ensuring the department operated in accordance with the law. *See Marohnic v. Walker,* 800 F.2d 613 (6th Cir. 1986) ("Public interest is near its zenith when ensuring that public organizations are being operated in accordance with

the law"). Defendants argue that Walraven posted the Notice in his capacity as an employee and union representative, not as a private citizen.

### 1.

The fact that speech or expression takes place within a government office does not in itself require a finding that the speech touches on matters of public concern. *Connick v. Myers*, 461 U.S. 138, 149 (1983). When a public employee speaks as an employee upon matters of personal interest instead of as a citizen upon matters of public concern, "absent the most unusual circumstance, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior." *Id.* at 147.  Furthermore, "an employee's speech, activity or association, merely because it is union-related, does not touch on a matter of public concern as a matter of law." *Akers v. McGinnis*, 352 F.3d 1030, 1038 (6th Cir. 2003) (citing *Boals v. Gray,* 775 F.2d 686, 693 (6th Cir. 1985)). Instead, "[w]hether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Connick*, 461 U.S. at 147-489.

In reviewing the content of Walraven's speech, the "pertinent question is not *why* the employee spoke, but *what* he said." *Farhat v. Jopke*, 370 F.3d 580, 591 (6th Cir. 2004).  Here, the content of the Walraven's speech was an explanation of fellow employees' right to union representation, specifically as it concerned work-related investigations. Walraven's statement took the form of a Weingarten Notice posted on the employee board inside the Bay County Jail. Walraven made his statement in the context of two unrelated office investigations regarding work-related employee misconduct and discipline. The statement was neither made to the public nor disseminated to the public, nor did the statement contain any information that would be

needed by or helpful to the public in making informed decisions about the operation of government. *See id*. at 590.

Walraven argues that his speech was union speech implicating protected *Weingarten* rights and thus is *per se* a matter of public concern. In *NLRB v. J. Weingarten, Inc.,* 420 U.S. 251 (1975), the United States Supreme Court upheld the National Labor Relations Board's conclusion that "an employer's denial of an employee's request to have a union representative present at an investigatory interview, which the employee reasonably believed might result in disciplinary action, was an unfair labor practice." *National Aeronautics and Space Admin v. Federal Labor Relations Authority*, 527 U.S. 229, 236 (1999). The Court reasoned that such representation was required under § 7 of the NLRA, which protects employees' right to engage in concerted activities. *Id*. (citing *Weingarten*, 420 U.S. at 260).[6]

But just because employees possess the right to have a union representative present at an investigatory interview, it does not follow that an employee and union representative advising other employees of that right has the absolute protection of the First Amendment. Walraven has provided no authority supporting that proposition. One court has considered the claim that advising employees of their *Weingarten* rights is protected speech. *See Lada v. Delaware Cty. Cmty. Coll.*, Case No. 08-CV-4754, 2009 WL 3217183, at *4 (E.D. Pa. Sept. 30, 2009). It held that such speech does not warrant any heightened First Amendment protection. In fact, it noted that speech directed at union activity within the workplace does not implicate a matter of public concern. *Id*.

Additionally, in *Gorum v. Sessoms*, 561 F.3d 179, 187 (3d Cir. 2009), the Third Circuit concluded that a professor speaking out on behalf of a student in the student's disciplinary

---

[6]    Any unfair labor practices claim would necessarily be litigated in the first instance in front of the National Labor Relations Board. The parties give no indication that this issue has been brought before the NLRB or that there was ever an allegation of unfair labor practices made by Walraven or any other employee of the jail.

proceeding was not public speech. It stated that "[t]here is no proof that he thought any public policy issues were at stake." *Id*. at 187. The court went on to note that even if the speech of the professor raised public issues, the speech must still be subject to the context-dependent First Amendment inquiry into "the content, form, and context of a given statement, as revealed by the whole record." *Connick*, 461 U.S. at 147-489. This fact was emphasized by the Sixth Circuit in *Akers v. McGinnis*, 352 F.3d 1030, 1038 (6th Cir. 2003), when it held that "an employee's speech, activity or association, merely because it is union-related, does not touch on a matter of public concern as a matter of law."

Also, beyond simply addressing employees' union rights, the Notice "strongly recommend[ed]" that Sheriff's Department employees advise union leadership "of what happened [in the interviews] for [their] protection and others." Defs.' Mot. Summ. J., Ex. AA, ECF No. 31-28. At best, this can be characterized as an expression of concern about the manner in which the Sheriff was investigating alleged misbehavior by Sheriff's Department employees. Such concerns, to the extent they are the basis for an employee's speech, "do not touch upon a matter of public concern and therefore fall outside the scope of First Amendment-protected speech." *Rodgers v. Banks*, 344 F.3d 587, 596 (6th Cir. 2003) (excluding from First Amendment protection "complaints about an employer's performance" (quoting *Brandenburg v. Hous. Auth. of Irvine*, 253 F.3d 891, 898 (6th Cir. 2001)).

Walraven argues that because he and Gillis had previously suggested that they might go to the Bay City Times and Bay County Human Resources to disclose alleged public corruption, the purpose of his proposed, hypothetical speech should be imputed to his actual act of posting the Notice. While Walraven may claim that he intended to go public with allegations of public corruption, he did not in fact do so. Intentions are irrelevant to the question of what statement

was actually made. *See Mosholder v. Barnhardt*, 679 F.3d 443, 450 (6th Cir. 2012) ("We are concerned with the distinction between matters of public concern and those only of private interest, 'not [between] civic-minded motives and self-serving motives.'" (quoting *Chappel*, 131 F.3d at 575)). Consequently, no such allegations of public corruption are at issue in this case. By its plain language, Walraven's statement was made to inform employees interviewed as part work-related investigations of their rights to union representation. Walraven's posting of the Notice was not speech touching on matters of public concern.

**2.**

Supposing that Walraven could show his speech touched on matters of public concern, he cannot show his interest in commenting on a matter of public concern outweighs the County's interest in promoting the efficacy and efficiency of the sheriff's office. *See Cockrel*, 270 F.3d at 1048; *Pickering*, 391 U.S. at 568.  As explained by the Sixth Circuit:

> In order to justify a restriction on speech of public concern by a public employee, plaintiff's speech must impair discipline by superiors, have a detrimental impact on close working relationships, undermine a legitimate goal or mission of the employer, impede the performance of the speaker's duties, or impair harmony among co-workers. The state bears the burden of showing a legitimate justification for discipline.

*Meyers v. City of Cincinnati*, 934 F.2d 726 (6th Cir.1991). Courts have emphasized that municipalities should be granted considerable deference in structuring and discouraging public dissension within its safety forces due to the substantial interest in maintaining an efficient organization to carry out law enforcement duties. *See, e.g.*, *Brown v. Ticy of Trenton*, 867 F.2d 318, 322 (6th Cir. 1989); *Kannisto v. San Francisco*, 541 F.2d 841, 844 (9th Cir. 1967). The Sixth Circuit has specifically referred to County Sheriff's Departments as a "paramilitary organizations." *Cherry v. Pickell*, 188 F. App'x 465, 471 (6th Cir. 2006).

Even if Walraven's speech advising employees of their *Weingarten* rights was per se a matter of public concern, and it is not, the Notice contained non-*Weingarten* speech. The final portion of the Notice stated, "Some of you may have been ordered not to discuss what was said in a meeting with your superiors. I strongly recommend you advise us of what happened for your protection and others." While the rest of the Notice may have properly advised Sheriff's Department employees of their rights under *Weingarten*, this portion of the Notice did not. This directive to discuss the subject-matter of internal investigatory interviews with union representatives is not a protected concerted activity under *Weingarten* or § 7 of the NLRA.

Walraven's suggestion that employees disclose the contents of interviews went against direct orders of superiors in the Sheriff's Department. It threatened the confidentiality and integrity of an investigation into employee misconduct at the jail, and threatened an investigation into the potentially criminal conduct of a jail employee. Thus, even if speech relating to *Weingarten* rights is public speech for purposes of the First Amendment,[7] Walraven cannot show that the disputed portion of the Notice was protected under *Weingarten*. He also cannot show that his interests in posting that portion of the Notice outweighed Defendants' strong interest in appropriately operating the County Sheriff's office. Because Walraven can do neither of these things, he cannot show that he was engaged in constitutionally protected speech. Accordingly, he cannot sustain a cause of action under 28 U.S.C. § 1983.

Walraven's inability to establish the first prong of a 28 U.S.C. § 1983 action—that he was deprived of a right secured by the Constitution or laws of the United States—means any further analysis of his claim and Defendants' arguments for its dismissal are unnecessary.

**B.**

---

[7]     And again, there is no law supporting that proposition. Every court to address the issue, including the Sixth Circuit, has held that union speech does not, as a matter of law, touch on a matter of public concern.

Having concluded that Walraven's federal claim is to be dismissed, his claims under state law for violation of the Michigan Public Employment Relations Act and the Michigan Whistleblowers' Protection Act must now be addressed.

The Court has supplemental jurisdiction over these state law claims because they form part of the same controversy as Walraven's federal claim. *See* 28 U.S.C. § 1367(a). However, this Court may decline to exercise supplemental jurisdiction if:

> (1) the claim raises a novel or complex issue of State law,
>
> (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,
>
> (3) the district court has dismissed all claims over which it has original jurisdiction, or
>
> (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c). When a plaintiff's federal claims have been dismissed on the merits, the question of whether to retain jurisdiction over the state law claims rests within the Court's discretion. *Blakely v. United States*, 276 F.3d 853, 860 (6th Cir. 2002). However, the dismissal of the claim over which the federal court had original jurisdiction creates a presumption in favor of dismissing without prejudice any state-law claims that accompanied it to federal court. *Id.* at 863. In addition, "[n]eedless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law." *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966). The issues presented are more appropriate for resolution by a state court and therefore the Court declines to exercise its supplemental jurisdiction. Walraven's supplemental state law claims will be dismissed without prejudice.

**IV.**

Accordingly, it is **ORDERED** that Defendants Bay County Sheriff's Department and Bay County Sheriff John Miller's Motion for Summary Judgment, ECF No. 31, is **GRANTED.**

It is further **ORDERED** that Count 1 of Plaintiff Fred Walraven's Complaint, ECF No. 1, is **DISMISSED with prejudice**.

It is further **ORDERED** that Counts 2 & 3 of Plaintiff Fred Walraven's Complaint, ECF No. 1, are **DISMISSED without prejudice**.

It is further **ORDERED** that Defendants' Motions *in Limine*, ECF Nos. 45, 46, 47, 48, 49, & 50, are **DENIED as moot**.

It is further **ORDERED** that Plaintiff Fred Walraven's Motion for Leave to File Supplemental Brief, ECF No. 60, is **DENIED**.


Dated: January 28, 2016                          s/Thomas L. Ludington
                                                 THOMAS L. LUDINGTON
                                                 United States District Judge


<div style="border:1px solid">

PROOF OF SERVICE

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on January 28, 2016.

s/Michael A. Sian
MICHAEL A. SIAN, Case Manager

</div>